**Affirmed and Memorandum Opinion filed October 27, 2011.**



**In The**

# Fourteenth Court of Appeals

————————————

**NO. 14-10-00768-CR**
**NO. 14-10-00769-CR**

————————————

**NERY EDUARDO BENAVIDES, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Cause No. 1225222 & 1225223**

## MEMORANDUM OPINION

Appellant, Nery Eduardo Benavides, was found guilty by a jury of aggravated sexual assault of a child and indecency with a child.[1]  *See* Tex. Penal Code Ann. §§ 21.11(a)(1), 22.021 (West 2011).  The trial court sentenced appellant to twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice on each conviction.  We affirm.

---

[1] The aggravated sexual assault of a child charge was brought in cause number 1225222, while the indecency with a child charge was brought in cause number 1225223.

## FACTUAL AND PROCEDURAL BACKGROUND

The complainant in both cause numbers is K.A. K.A. was fifteen years' old at the time of appellant's trial and was thirteen when she made her first outcry.

While K.A. was in eighth grade at Hambrick Middle School she was reading a book about sexual abuse in her language arts class. K.A. became upset and laid her head down on her desk. When that class period ended, K.A. went to her next class and that teacher sent K.A. to see a counselor.

Rose Alvarez is a counselor at an Aldine Independent School District ("AISD") middle school and she was the first witness to testify. K.A. came into Alvarez's office and sat down in the corner of the office. K.A. remained quiet, made no eye contact with Alvarez, and put her face in her hands. Alvarez had to leave her office for lunch duty, so he gave K.A. a piece of paper and asked her to write down her feelings and they would talk about it when she returned.

When Alvarez returned to her office thirty minutes later, K.A. was still there. In Alvarez's absence, K.A. had written on the sheet of paper. The paper was entered into evidence as State's Exhibit 1. In addition to detailing K.A.'s feelings, K.A. had also written in three lines: "made me touch his private parts," "licked me in private parts," and "take clothes off and get on top of me." Alvarez then began talking to K.A. about what she had written. The two of them went sentence by sentence through everything K.A. had written. They talked for more than an hour. During that discussion, Alvarez learned the sexual abuse had begun when K.A. was seven or eight and had continued for some period of time. K.A. identified appellant as one of the people who had sexually abused her.

Alvarez testified that K.A. made A's and B's and that she had no discipline problems at school.

Alvarez informed the school principal of the situation and she then called the police. Deputy Mitchell Pena of the Harris County Sheriff's Department arrived soon after

2

Alvarez had called the police.[2] After he arrived in Alvarez's office, Pena contacted Children's Protective Services ("CPS") about the situation.

Alvarez also telephoned K.A.'s mother, M.T. Alvarez asked M.T. if she could come to the school as quickly as possible. She also asked M.T. to come alone. Alvarez was not certain if she told M.T. the reason she was asking her to come to the school. M.T. arrived about 45 minutes after Alvarez called. Despite Alvarez's request that she come alone, M.T. was accompanied by a cousin. M.T. came into Alvarez's office and without talking to Alvarez, Pena, or K.A., she slapped K.A. twice with the flat of her hand. Pena instructed M.T. to calm down. Alvarez then told M.T. that K.A. had said that appellant, her two older brothers, and a cousin had sexually assaulted her. Pena eventually took K.A. to CPS and when he did, M.T. followed in her own car.

K.A. testified next. At the time of appellant's trial, K.A. was in the tenth grade at AISD high school. K.A. plays basketball, volleyball, and she runs track. K.A. also testified that she is still an A-B student. K.A. testified that she stays out of trouble, has never been suspended, and has never been in a gang.

K.A.'s testimony then turned to the allegations against appellant. K.A. confirmed that she was upset by the book they were reading in her language arts class because the situation in the book "was kind of like what was going on with [her]." K.A. testified that she was about six years old when the abuse began. K.A. could not remember what grade she was in when the abuse started. K.A. verified that she had detailed the sexual abuse she experienced in the writing she had done in Alvarez's office. According to K.A., in the first incident, appellant took her into his bedroom and he touched her breast and private parts underneath her clothes. She testified that appellant stopped when they heard someone coming. K.A. did not tell anyone about the incident because she was afraid no one would believe her. K.A. testified the abuse occurred almost every day. K.A.

---

[2] Deputy Pena testified that his first name is "Mitchell;" however, he is identified in the contents section of the Reporter's Record as "Jose."

3

testified the incidents occurred in appellant's bedroom, her bedroom, and the trailer's bathroom. During some of the incidents, appellant came into K.A.'s room wearing only a towel, he would place K.A. on his lap and make her touch his private parts. K.A. also testified that appellant would place his mouth on her private parts. According to K.A., this occurred about two times. K.A. also testified that appellant would take his clothes off and get on top of K.A. K.A. explained the incidents occurred during the day after she came home from school. According to K.A., there were no adults home when the incidents took place. According to K.A., the incidents went on for a long time.

K.A.'s father died when she was a little girl. Her mother, M.T. eventually married another man, Evelio. According to K.A., they lived alone in a three bedroom trailer located off West Little York. The family eventually moved the trailer a few blocks away to a location on Cedar Hill. K.A. could not remember exactly when they moved, but she testified it could have been the summer before she started the fourth grade. K.A. testified that appellant, who was Evelio's nephew from Honduras, lived with them when the trailer was on West Little York, not when they lived on Cedar Hill.[3] K.A. was not certain how long appellant lived with them in the trailer, but she thought it was a long time, more than a year. K.A. testified that while appellant was living in the trailer, she shared a room with her two brothers, E.A. and J.A. According to K.A., while he lived in the trailer, appellant had his own bedroom.

K.A. testified that she has lived with her aunt, her mother's sister, in an almost identical trailer, since she reported the abuse. K.A. also testified that, prior to the time she reported the sexual abuse, she had a good relationship with her mother. K.A. considered her mother to be a strict, but good mother. K.A. testified that her mother did not ask her what was wrong when she came to Alvarez's office. K.A. also testified that she has never talked to her mother about the abuse. She also testified that her mother has told her that

---

[3] K.A. explained the sequence of various relatives moving into the trailer on West Little York. According to K.A., appellant arrived first, followed by her brother E.A., and finally her other brother J.A. All came from Honduras.

she does not believe K.A. was sexually abused. However, despite telling K.A. she does not believe she has been sexually abused, K.A. testified that her mother drives her to therapy at the Children's Assessment Center once a week. K.A.'s mother continues to do this even though CPS no longer requires that K.A. go to therapy.

During her testimony, K.A. denied having a boyfriend at the time she first reported the sexual abuse. K.A. also denied that she hung around with people she had been told not to hang around with. K.A. denied that when she was thirteen, she wanted to stay out later than her mother allowed. She also denied that she had ever sought out information about how to join a gang or that her brother Edwin had seen her doing that and had reported it to her mother.

Deputy Pena was the next witness to testify. Pena testified that he responded to the call reporting a sexual assault. According to Pena, he went to Alvarez's office where he interviewed K.A. Pena described K.A. as scared and afraid, specifically that she was afraid of her mother. Pena testified that M.T. arrived while he was on the telephone with CPS. He then heard M.T. screaming and hitting K.A. Pena then heard K.A. crying and yelling because M.T. had struck her. Pena separated K.A. and her mother and he then explained the situation to M.T. Pena then drove K.A. to the CPS facility. Pena said K.A. was scared and crying the whole time he was with her.

Sergeant James Fitzgerald from the Harris County Sheriff's Department testified next. Fitzgerald was assigned to the Children's Assessment Center and he was the investigator on K.A.'s sexual abuse complaints.[4] Fitzgerald was investigating all four people K.A. had accused of abusing her. Fitzgerald was able to contact and talk to both of

---

[4] Fitzgerald explained the function of the Children's Assessment Center. According to Fitzgerald, the Children's Assessment Center is a one-stop facility to investigate allegations of child sexual abuse. Law enforcement, CPS workers, psychologists, and pediatric medical specialists are all assigned to the Center and they are able to completely investigate allegations of sexual abuse and also provide psychological services and any other follow-up services a sexual abuse victim might require.

K.A.'s brothers, but he was unable to locate the cousin, and was not able to talk to appellant.

Fitzgerald detailed how he investigated K.A.'s sexual abuse complaints. Initially, he watched the videotape of K.A.'s initial interview with the Houston Police Department at the Children's Assessment Center. According to Fitzgerald, the statements made by K.A. in her police interview were consistent with her initial report of sexual abuse. Fitzgerald also interviewed family members and school counselors to get K.A's history. Fitzgerald testified he did not uncover anything during his investigation that made him question K.A.'s statements. Fitzgerald also testified that K.A. did not exhibit any behavior changes or change in her grades. According to Fitzgerald, this is fairly consistent with delayed outcry cases.

Fitzgerald also reported that K.A. did not have any criminal history or history of gang involvement. This was the case despite the fact that one of K.A.'s brothers told Fitzgerald that he thought K.A. was trying to join a gang. One brother also told Fitzgerald he believed K.A. had a boyfriend. However no one could tell Fitzgerald the name and he never followed up on that information. Fitzgerald testified that he found it a little odd that the brothers could not provide any details such as the name of the gang, or some idea of what it was or where the gang was located. The State rested at the conclusion of Fitzgerald's testimony.

Appellant then called several witnesses. Appellant's first witness was M.T., K.A.'s mother. M.T. testified that she believed appellant came to live in her trailer in 2000 and that he lived there for about six months. According to M.T., when appellant moved into the trailer, five people were already living there: M.T., Evelio, K.A., and K.A.'s half-brothers K. and C. M.T. testified that appellant started working with her husband Evelio the day after his arrival from Honduras. M.T. also testified that appellant and Evelio worked six days a week from six in the morning to six or seven in the evening.

6

M.T. also testified about K.A.'s sexual abuse allegations. M.T. received a call from a school counselor who asked her to come to the school immediately. M.T. told the counselor she needed the reason so she could explain to her boss why she needed to leave work early. According to M.T., the counselor told her that K.A. "had had sex." M.T. admitted she was upset when she arrived at the school and that she slapped K.A. According to M.T., she slapped K.A. because she thought K.A. had had sex with one of her school friends and M.T. felt this had broken her trust by not telling her first. M.T. testified the counselor and the deputy explained the reason she had been called to the school. M.T.'s response was "that's not right. That that's a lie." M.T. told the deputy this even though she had not talked to K.A., she simply did not believe her allegations. In addition, M.T. testified that none of her family believes K.A.

M.T. also denied K.A. and the other young children were ever left alone in the trailer, not even after they got off from school. According to M.T., the children would get dropped off the school bus at her sister Blanca's trailer and she would then take care of the children after school. M.T. directly testified she did not believe K.A. was telling the truth.

M.T. testified that she had always had an excellent relationship with K.A. until K.A. reached the age of thirteen. According to M.T., K.A. wanted the same amount of freedom that her two older brothers had at that time. When M.T. refused to bend on her rules, K.A. became upset with her. K.A. then always got very quiet around M.T. and started telling her that she wanted to live with M.T.'s sister. M.T. thought K.A. wanted to live with her aunt because "she gives her, her freedom." As an example of the freedom K.A. has living with her aunt, M.T. testified that K.A. now goes to parties every weekend and can stay out until one or two o'clock in the morning.

M.T. also testified that K.A. had expressed interest in finding out about gang activities and she believed K.A. was hanging out with a neighbor, a person M.T. believed might not be of good character. However, on cross-examination, M.T. admitted she had

7

never been called to school because K.A. had gotten in trouble, that K.A. gets very good grades, and is on several sports teams.

Finally, M.T. testified that she still takes K.A. to therapy once a week.

The next witness to testify was Evelio, M.T.'s husband. Evelio testified appellant is his nephew and he arrived from Honduras on April 27, 2000. According to Evelio, appellant started working for him the day after his arrival. Evelio testified they worked six days a week and they worked from six in the morning until six or seven in the evening. Evelio also testified that appellant lived in the trailer for about six months.

Evelio testified that he did not believe K.A.'s accusations. He also admitted he had never discussed the allegations with appellant. Evelio also admitted that he, M.T., E.A., and J.A., had met with appellant's defense counsel to prepare for the trial. According to Evelio, they discussed K.A.'s allegations.

E.A. was the next witness to testify for appellant. According to E.A., he lived in the trailer with K.A., M.T., Evelio, and his two little brothers. E.A. testified appellant came from Honduras after he did. E.A. testified the first time he met appellant was when he arrived at the trailer from Honduras. E.A. also testified appellant lived in the trailer for about six months. E.A. denied sexually abusing K.A. E.A. classified M.T. as a strict mother. On cross-examination, E.A. admitted he was not able to provide Fitzgerald with any information about any gangs K.A. might have been interested in or the name of any boyfriend K.A. might have had. Finally, E.A. testified that he does not believe his sister and believes she is making up all of the accusations against appellant.

Next, appellant testified in his own defense. Appellant testified he arrived in the United States in April of 2000 when he was seventeen. Appellant moved in with his uncle and he lived there for about six months. Appellant also worked with his uncle as a plumber's assistant. According to appellant, he worked in that job from April 2000 until

8

April of 2003. Appellant testified that he and his uncle worked every day, with an occasional Sunday at home.

Appellant then denied K.A.'s accusations. Appellant also admitted he never talked to Fitzgerald during his investigation of K.A.'s accusations.

On cross-examination, in response to a question asking how long it took him to earn a journeyman's or apprentice plumber's license, appellant answered: "Sir, given my illegal situation, I couldn't obtain a plumbing license, but on behalf of the company, I got a helper's license." Appellant then admitted that both he and his entire family were aware that a conviction meant that he could be permanently deported.

When asked about the fact he never met with Fitzgerald during his investigation, appellant admitted his uncle never told him that somebody was looking for him. Appellant also testified that his uncle did not know where he lived, his telephone number, or any way to get in touch with him. Appellant then testified: "Between my uncle and I, we don't spend much time together." Appellant also admitted that he had never spoken with his uncle or any of his uncle's family about K.A.'s accusations. Then, in response to the following: "So, without talking to you, everyone just doesn't believe [K.A.]. They just assume you are telling the truth, correct?" appellant answered "Yes, sir."

After appellant testified, appellant rested. The State then called two rebuttal witnesses. The first rebuttal witness was Dr. Danielle Medera, a staff psychologist at the Children's Assessment Center who had worked with K.A. for approximately one year.

Medera testified about the effects of sexual abuse on children. According to Medera, "the effects of trauma all depend on the individual." As a result, therapists such as herself, "see a huge spectrum of symptoms in the children depending on age and gender and what not." Medera testified that while some children may experience bad grades and discipline issues as a result of abuse, others, such as a child who is experiencing trauma at home on a daily basis, might do very well in school because they view school as a safe

9

place where they can control their own life. Medera then turned specifically to K.A. Medera testified that K.A. did have a lot of interpersonal issues when she started working with her. According to Medera, K.A. "has problems making eye contact, making friends, trusting people. So while she may have had an A in a regular English class, she has a lot of symptomatology. She may be bright but she's also suffering in a lot of other areas."

Medera also testified about children and their memory regarding traumatic events. According to Medera, children frequently have fragmented memories regarding the traumatic event. She then testified that:

> [d]epending on the child, there may be salient features of the incident that stick with them. It could be sensory issues like sight, smell, where they were.
>
> A lot of times, if you have a child that's been victimized and re-victimized over years, expecting them to go back and remember exactly how old they were on this one incident, you know, at what time of day it was when they were raped on a daily basis, none of us could remember that four years ago. If it is something that happened to you every day, you wouldn't remember the time that it happened on Wednesday, four years ago, necessarily, what dates and times.

Medera next testified about delayed disclosure of sexual abuse. According to Medera, over half of her patients had a delayed outcry. Medera explained delayed outcry often results from the fact that the abuser is someone the victim knows and trusts. As a result of that dynamic, the sexual abuse victim starts "feeling shame or guilt" and that causes them to delay disclosing the abuse. Medera then discussed what may cause or trigger a child to disclose sexual abuse. Medera explained this varies from child to child and it is not unusual for the initial disclosure to occur with a non-family member. According to Medera, this is especially true if the victim has a particularly close relationship with a family member, such as a mother. Medera explained the child is trying to protect the family member.

10

Medera also explained that it is not unusual for family members to not believe a child alleging sexual abuse. Medera testified that parents are frequently in denial often because they "don't want to believe that this happens in society, let alone this happened in your house." Medera then turned specifically to K.A.'s case:

> [K.A.'s] mother, from what [K.A.] describes in group therapy, does not believe that the abuse happened. The conflict that we see is that [K.A.'s] case is closed with CPS. There's no reason, once CPS stops mandating the child comes to therapy, that she needs to be transported or brought to therapy. So, basically, mom could have stopped bringing her when CPS closed the case. But mom continually brings her to therapy on time. Every week we see [K.A.].
>
> So, for me, my question is, if you really don't believe it happened, why would you continually bring your daughter to therapy? At some level does she know what happened[?]

Medera was then asked about 'coaching." Medera testified she did not believe K.A. had been coached. In Medera's experience, the coaching cases she had seen occurred in divorce situations. Medera explained you can frequently discover when a child has been coached because it is difficult for a child to keep straight in their minds the story they are supposed to tell because it really did not happen to them. Medera then testified that she did not have any coaching concerns about K.A. and that K.A. has maintained her version of events since Medera started working with her.

On cross-examination, the following exchange occurred:

[Defense Counsel]: Would you agree with me, Doctor, that not all kids tell the truth?

[Medera]: Yes, I agree with you.

[Defense Counsel]: Would you also agree with me that even though some kids go through therapy, they might not be telling the truth?

[Medera]: About the sexual abuse?

[Defense Counsel]: Yes.

11

[Medera]: I do not believe that children make this up.

[Defense Counsel]: You're basically testifying in front of this jury that you don't think that kids make up situations dealing with sexual abuse?

[Medera]: In my clinical experience, the only time I've seen children say something like this is in a coaching case. And in this case coaching isn't relevant.

[Defense Counsel]: I just gave an example where the kids with mama move into a new house with a new stepfather, a new father. The mother never tells the kids, "here, say things about the new father so that I can split up with the new father and go back to your father." It's basically something that's created by the kids themselves.

[Medera]: I understand children saying things to be able to break up the new marriage, but sexual abuse is not something that children can make up to break up anything.

[Defense Counsel]: Your testimony here today is that kids don't make up sexual abuse allegations to break up a family?

[Medera]: In my clinical experience at the CAC, no, I have not seen that situation happen, and especially keeping a story consistent over this length of time. There's no reason for a child to do that.

The second rebuttal witness was Stacey Sederis, an assistant district attorney with the Harris County District Attorney's office. Sederis testified regarding two issues: (1) the procedures involved in handling investigations of child abuse allegedly committed by a juvenile, who, by the time the alleged victim makes an outcry, has become an adult; and (2) the District Attorney's decision to not accept charges against K.A.'s two older brothers. The essence of Sederis' testimony is that the reason the District Attorney's office did not accept charges against K.A.'s now adult brothers E.A. and J.A. was a matter of timing.

According to Sederis, when a person is suspected of committing a sexual assault as a juvenile, but has become an adult by the time the victim discloses the incident, the district attorney, in order to prosecute the suspect, must get the suspect certified as an adult.

12

Sederis then explained it was the policy of the Harris County District Attorney to not seek to certify a juvenile suspected of committing a crime as an adult unless it is a murder, capital murder, or aggravated sexual assault. Sederis then continued:

> In sex cases it's extremely rare for us to certify a sex case, whether it's an indecency or sexual assault of a child because normally what he [sic] want - - kind of the way the office views it is we need to provide as many services as possible to that juvenile so that we can help them kind of transition into adulthood without having any sort of psychological or emotional problems. And the juvenile probation department has many, many services for kids, whereas the adult system doesn't.
>
> So it's very rare for us as an office to certify any sort of sex crime unless the - - unless there's something really aggravating about it; for instance, a gun or any sort of weapon was used, or the complainant was kidnapped, or something like that, then we may consider certification.

Sederis then testified that the decision was made not to accept the charges against K.A.'s older brothers because the district attorney's office was "boxed into a legal loophole because [it] did not find out about those cases until later because the complainant didn't outcry on those. I believed in the merits of the case. I believed that we should accept charges on both of those suspects. My superior, the prosecutor above me, also believed that we should accept charges on those cases. We both believed the complainant was telling the truth, we just couldn't because of the age."

Following the close of the evidence, the jury found appellant guilty of both charges. The trial court assessed appellant's punishment at twenty years' confinement in the Institutional Division of the Texas Department of Criminal Justice on each conviction. This appeal followed.

## DISCUSSION

Appellant raises five issues on appeal. We address each of those issues in turn.

## I. Sufficiency of the evidence

In his first issue, appellant contends the evidence adduced at trial by the State was insufficient to support his convictions. We disagree.

## A.    The standard of review

In a sufficiency review, we view all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Salinas v. State*, 163 S.W.3d 734, 737 (Tex. Crim. App. 2005). The jury, as the sole judge of the credibility of the witnesses, is free to believe or disbelieve all or part of a witness's testimony. *Jones v. State*, 984 S.W.2d 254, 257 (Tex. Crim. App. 1998). The jury may reasonably infer facts from the evidence presented, credit the witnesses it chooses to, disbelieve any or all of the evidence or testimony proffered, and weigh the evidence as it sees fit. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Reconciliation of conflicts in the evidence is within the jury's discretion, and such conflicts alone will not call for reversal if there is enough credible evidence to support a conviction. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). An appellate court may not re-evaluate the weight and credibility of the evidence produced at trial and in so doing substitute its judgment for that of the fact finder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Inconsistencies in the evidence are resolved in favor of the verdict. *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000). We do not engage in a second evaluation of the weight and credibility of the evidence, but only ensure the jury reached a rational decision. *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993); *Harris v. State*, 164 S.W.3d 775, 784 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

## B.    Analysis

Appellant was charged with two offenses: aggravated sexual assault of a child and indecency with a child. To establish the offense of aggravated sexual assault of a child, the State must prove appellant intentionally or knowingly caused the sexual organ of a

14

child to contact or penetrate the mouth of another person, including the actor, and the victim was younger than fourteen years of age. Tex. Penal Code Ann. §§ 22.021(a)(1)(B)(iii), (a)(2)(B) (West 2011). To establish the offense of indecency with a child, the State must prove appellant engaged in sexual contact with a child younger than seventeen years of age and that appellant is not the person's spouse. *Id.* at § 21.11(a)(1). "Sexual contact" means any touching of the anus, breast, or any part of the genitals of another person with the intent to arouse or gratify the sexual desire of any person. *Id.* at § 21.01(2).

In this case, the State presented the testimony of K.A. detailing the sexual abuse inflicted by appellant. K.A.'s testimony described exactly what appellant did to her as well as where the abuse occurred. K.A. also provided a timeframe for when the abuse occurred. This evidence, the testimony of K.A. describing the events, standing alone is sufficient to support appellant's convictions.[5] *See Lane v. State*, 174 S.W.3d 376, 386 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (concluding that, because the complainant was able to describe the sexual contact, the location where the contact occurred, and her statements were consistent with the statements she made at the Children's Assessment Center, her testimony was sufficient to support the conviction); *see also Jensen v. State*, 66 S.W.3d 528, 534 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd) ("The testimony of a victim, standing alone, even when the victim is a child is sufficient to support the conviction for sexual assault."). The jury also heard the various witnesses who testified they did not believe K.A. had been sexually abused by appellant. However, the jury is the exclusive judge of the credibility of the witnesses and the weight to be given to their testimony. *Tinker v. State*, 148 S.W.3d 666, 669 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Therefore, the jury could reasonably have chosen to believe K.A.'s testimony and disbelieve the testimony of appellant and K.A.'s family members.

---

[5] This evidence includes K.A.'s testimony she was not married to appellant and her age at the time of the events at issue in this case.

15

We conclude the evidence is sufficient to support appellant's conviction. We overrule appellant's first issue.

## II.    Date of the alleged offenses in the indictments

In his second issue, appellant contends his due process rights were violated because the indictments did not specify a date or distinguish between conduct on any given date that corresponded reasonably near the date alleged in the indictments: "on or about November 29, 2004." Appellant goes on to argue that K.A. testified the sexual abuse occurred when she was six or seven years old which would place the events in either 2000 or 2001, three years earlier than the date alleged in the indictments.[6] According to appellant, this violated his right to adequate notice as guaranteed by the Due Process of Law Clause of the Fourteenth Amendment to the United States Constitution.

In both indictments, the State alleged appellant committed the offenses on or about November 29, 2004. In addition, both jury charges instructed the jury they were not bound by the specific date alleged in the indictment. Instead, the jury was instructed "that a conviction may be had upon proof beyond a reasonable doubt that the offense, if any, was committed at any time within the period of limitations." At the time the offenses were committed, the statute of limitations for both aggravated sexual assault of a child and indecency with a child is ten years from the date of the victim's eighteenth birthday. *See* Act of May 28, 1997, 75th Leg., R.S., ch. 740, §§ 1, 4, 1997 Tex. Gen. Laws 2403 (amended 2007) (current version at Tex. Code Crim. Proc. Ann. art. 12.01(1) (West Supp. 2009)) (sexual assault); *see also* Act of May 30, 2005, 79th Leg., R.S., ch. 1162, § 6, 2005 Tex. Gen. Laws 3802, 3806 (amended 2009) (current version at Tex. Code Crim. Proc. Ann. art. 12.01(1) (West Supp. 2009)) (indecency with a child).

---

[6] This calculation is based on K.A.'s birth date of November 30, 1994.

16

Typically, the date alleged in an indictment is an approximation that allows the State to prosecute a defendant for acts occurring within the limitations period. *Hendrix v. State*, 150 S.W.3d 839, 853 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd). The "on or about" language of an indictment allows the State to prove a date other than the one alleged in the indictment as long as the date is anterior to the presentment of the indictment and within the statutory limitations period. *Id.* Therefore, when an indictment alleges that some relevant event transpired "on or about" a particular date, the accused is put on notice to prepare for proof that the event happened at any time within the statutory limitations period. *Thomas v. State*, 753 S.W.2d 688, 693 (Tex. Crim. App. 1988). We overrule appellant's second issue on appeal.

## III.    Appellant's vouching claim

In his third issue, appellant complains that the prosecutor engaged in egregious conduct by eliciting testimony that impermissibly vouched for K.A. and then referencing that testimony in his closing argument. Appellant contends the prosecutor initially engaged in impermissible vouching by calling Sederis to the witness stand and then he:

> [L]unged into how the workings of the Harris County District Attorney's intake division worked and how it was that juvenile cases were considered through the juvenile division of the Harris County District Attorney's intake division in order to explain what it was that caused the District Attorney's office to reject filing charges against KA's brothers and to emphasize the credibility of KA and the credibility of the district attorney's office when charges are ultimately brought to bear upon an accused.

Appellant also contends that the State engaged in improper vouching during closing argument when the prosecutor, referencing the State's decision to not accept charges against K.A.'s two older brothers, said: "The case law is very clear. Our hands were basically tied, certainly on the younger brother." The end result of all this according to appellant, was that it was as if the prosecutor himself was testifying.

17

In order to preserve a complaint for appellate review, the record must reflect that it was brought to the attention of the trial court in accord with applicable rules by a timely request, objection, or motion which specifically sets out the nature of the complaint in a sufficiently comprehensible manner that it informs the trial court of its nature and basis and obtained either an adverse ruling or a refusal to rule. Tex. R. App. P. 33.1(a); *Moore v. State*, 278 S.W.3d 444, 451 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Prosecutorial misconduct is an independent basis for an objection that must be specifically urged in order for error to be preserved. *Temple v. State*, 342 S.W.3d 572, 603 n.10 (Tex. App.—Houston [14th Dist.] 2010, no pet.). In support of his argument that the prosecutor engaged in egregious conduct, appellant referenced numerous pages in the reporter's record. However, nowhere on the referenced pages did appellant lodge a prosecutorial misconduct objection. Therefore, we conclude appellant has failed to preserve this issue for appellate review.

To the extent appellant's third issue can be construed as an issue complaining that the trial court erred by admitting evidence that improperly vouched for K.A.'s credibility, we conclude appellant has also failed to preserve that issue for appellate review as he did not object on that basis in the trial court.[7] We overrule appellant's third issue.

## IV. Appellant's bolstering claim

In his fourth issue, appellant contends the prosecution improperly bolstered K.A.'s credibility by eliciting testimony on that subject from three different witnesses: Fitzgerald, Sederis, and Medera. In support of this issue appellant once again cites to numerous pages in the reporter's record of appellant's trial. However, having checked the referenced pages, we find no objections that the challenged testimony improperly bolstered K.A.'s credibility. For the reasons stated above in Part III of this opinion, we hold

---

[7] We note appellant admits there were no objections lodged in his discussion of his fifth issue asserting his trial counsel was ineffective.

18

appellant failed to preserve this issue for appellate review. We overrule appellant's fourth issue on appeal.

## V.     Ineffective assistance of counsel claim

In his final issue on appeal, appellant contends he received ineffective assistance of counsel because his trial attorney (1) failed to object to allegedly improper vouching and bolstering testimony; (2) failed to limit the testimony of Alvarez, the outcry witness; and (3) failed to object to the State's allegedly improper and prejudicial final argument.

### A.     The standard of review

In reviewing claims of ineffective assistance of counsel, we apply a two prong test. *See Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984)). To establish ineffective assistance of counsel, appellant must prove by a preponderance of the evidence that (1) his trial counsel's representation was deficient in that it fell below the standard of prevailing professional norms, and (2) there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Id.*

An accused is entitled to reasonably effective assistance of counsel. *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983). However, reasonably effective assistance of counsel does not mean error-free representation. *Ex parte Felton*, 815 S.W.2d 733, 735 (Tex. Crim. App. 1991). When evaluating a claim of ineffective assistance, the appellate court looks to the totality of the representation and the particular circumstances of the case. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). There is a strong presumption that counsel's actions and decisions were reasonably professional and were motivated by sound trial strategy. *Salinas*, 163 S.W.3d at 740; *Stults v. State*, 23 S.W.3d 198, 208 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must

19

be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Thompson*, 9 S.W.3d at 814. When determining the validity of an ineffective assistance of counsel claim, any judicial review must be highly deferential to trial counsel and avoid the deleterious effects of hindsight. *Ingham, v. State*, 679 S.W.2d 503, 509 (Tex. Crim. App. 1984). When the record is silent as to the reasons for trial counsel's conduct, a finding that trial counsel was ineffective would require impermissible speculation by the appellate court. *Stults*, 23 S.W.3d at 208. Absent specific explanations for counsel's decisions, a record on direct appeal will rarely contain sufficient information to evaluate an ineffective assistance claim. *Bone v. State*, 77 S.W.3d 828, 833 (Tex. Crim. App. 2002). When trial counsel has not had an opportunity to explain his or her actions or inactions, an appellate court cannot find deficient performance unless the challenged conduct was "so outrageous that no competent attorney would have engaged in it." *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005).

If a criminal defendant can prove trial counsel's performance was deficient, he still must prove he was prejudiced by his counsel's actions. *Thompson*, 9 S.W.3d at 812. This requires the defendant to demonstrate a reasonable probability that the result of the proceeding would have been different if the trial counsel had acted professionally. *Id.* A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Malett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

### B. Vouching and bolstering

In the first part of his final issue, appellant asserts his trial counsel was ineffective because he did not object to evidence that he argues constituted a direct comment on the truth of K.A.'s allegations against appellant. Under this sub-issue, appellant challenges his trial counsel's failure to object to Fitzgerald's testimony during the State's case-in-chief, as well as Medera's and Sederis' rebuttal testimony. In addition, while acknowledging that in most cases the record is inadequate on direct appeal to resolve ineffective assistance of counsel claims, appellant argues this case falls into that small

group of cases where the record establishes ineffective assistance of counsel as a matter of law despite the fact trial counsel has not had an opportunity to explain his handling of appellant's defense.

To overcome the presumption of reasonable professional assistance, any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Thompson*, 9 S.W.3d at 813. Appellant did not file a motion for new trial. In addition, appellant's trial counsel was not afforded the opportunity to explain his decisions or trial strategy. Accordingly, the record is silent as to the reasons for trial counsel's conduct.

The Court of Criminal Appeals recently addressed an ineffective assistance of counsel case involving facts similar to those at issue here. *See Lopez v. State*, 343 S.W.3d 137 (Tex. Crim. App. 2011). In *Lopez*, the Court of Criminal Appeals stated that it is a rare case in which trial counsel's ineffectiveness is apparent from the record and an appellate court may address and dispose of the claim on direct appeal. *Id.* at 143. The court declared that it is a "difficult hurdle to overcome: the record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.* The court went on to hold that because the record was silent as to why trial counsel failed to object to the extra outcry witnesses' testimony which served solely to enhance the complainant's credibility, the defendant failed to meet his burden under the first Strickland prong. *Id.*

We turn first to appellant's allegation that his trial counsel's performance was deficient because he did not object to four different parts of Fitzgerald's testimony during the State's case-in-chief. First, appellant contends his trial counsel should have objected when the State asked Fitzgerald if there was anything in his investigation that made him question K.A.'s statements. Fitzgerald answered "no." Second, appellant complains that his trial counsel should have objected when the State asked Fitzgerald "what sort of

21

research did you do on [K.A.] just for your own knowledge on whether or not she may be telling the truth or lying?" Fitzgerald then detailed his investigation of K.A.'s complaints. Third, appellant asserts his trial counsel should have objected when the State asked "when presenting these cases for charges, do you input your own opinion and your own background and expertise into whether or not you believe charges are more valid than others?" Fitzgerald answered "Yes, sir, I do." Finally, appellant complains that his trial counsel should have objected when the State asked "[a]nd you felt after your investigation to file the charges?" Fitzgerald answered "yes, sir."

Even assuming Fitzgerald's testimony was a direct comment on K.A.'s credibility, it is plausible that appellant's trial counsel did not object to the above testimony because he sought to attack K.A.'s credibility by having Fitzgerald testify on his investigation and the reasons why charges were not brought against the three other people K.A. alleged had sexually abused her. *See Alexander v. State*, 282 S.W.3d 701, 709 (Tex. App.—Houston [14th Dist.] 2009, pet. ref'd) ("a strategy that seeks to establish that the defendant is not guilty while discrediting contrary testimony by the State's key witness on elements of the charged offense is objectively reasonable"). Therefore, since the record is silent as to why appellant's trial counsel failed to object to Fitzgerald's testimony, appellant did not meet his burden under the first *Strickland* prong. *Lopez*, 343 S.W.3d at 143; *Goodspeed*, 187 S.W.3d at 392.

We turn next to the testimony of the two rebuttal witnesses, Medera and Sederis. Madera testified (1) on the characteristics of coaching; (2) that K.A. had maintained her version of the events throughout the time Medera had dealt with her; and (3) she did not believe K.A. had been coached. During Sederis's testimony, she explained why the decision was made to not accept charges against K.A.'s brothers. Sederis also testified that she "believed in the merits of the case. I believed that we should accept charges on both of those suspects. My superior, the prosecutor above me, also believed that we should accept charges on those cases. We believed [K.A.] was telling the truth, we just

couldn't because of the age." Appellant asserts his trial counsel's failure to object to this testimony qualifies as one of those rare cases when the record on direct appeal establishes ineffective assistance of counsel even though it does not reveal his trial counsel's subjective reasoning.

Once again, even assuming the challenged testimony was an improper direct comment on K.A.'s credibility, it is plausible that appellant's trial counsel did not object to the above testimony as part of a reasonable trial strategy to deal with a case that would be decided by whether or not the jury believed K.A.'s testimony.[8] Specifically, appellant's trial counsel could have elected not to object to Medera's testimony because he wanted the opportunity to attack K.A.'s credibility by having Medera testify about possible motives K.A. might have to fabricate her allegations against appellant. Likewise, appellant's trial counsel may not have objected to Sederis's testimony as he saw an additional opportunity to attack K.A.'s credibility by emphasizing the role of the investigating officer in the district attorney's decision to not accept charges against K.A.'s brothers. During cross-examination, Fitzgerald testified that both of appellant's brothers denied K.A.'s allegations. Fitzgerald also testified that he "saw nothing to disbelieve what they were telling me." Appellant's trial counsel was then able to emphasize Fitzgerald's role in the district attorney's decision not to accept charges against the brothers during Sederis's testimony in an effort to convince the jury that K.A. was not telling the truth in any of her allegations. We conclude appellant's trial counsel's failure to object to Medera's and Sederis's testimony does not constitute conduct so outrageous that no competent attorney would have engaged in it. Therefore, since the record is silent as to why appellant's trial

---

[8] During the final seconds of his closing argument during the guilt-innocence phase, appellant's trial counsel told the jury: "it comes down to whether you want to believe [K.A.] or you want to believe the mother, Evelio the father, [E.A.] the brother, [appellant] the father's nephew, and they are all circling the wagons just because they don't want [appellant] deported."

23

counsel failed to object, appellant did not meet his burden under the first *Strickland* prong. *Lopez*, 343 S.W.3d at 143; *Goodspeed*, 187 S.W.3d at 392.

## C. Alvarez's outcry testimony

Appellant contends his trial counsel was ineffective because he failed to request the hearing required by article 38.072 of the Code of Criminal Procedure and thereby limit the amount of hearsay testimony admitted during his trial. *See* Tex. Code Crim. Proc. Ann. art. 38.072 (West 2005).

Article 38.072 provides that a child abuse victim's statement regarding the abuse made to another person is not inadmissible hearsay if the statement describes the alleged offense and the person to whom the statement is made is at least eighteen years old and is the first person to who the child made a statement about the offense. *Id.* Article 38.072 also requires that the State give notice of its intent to use an outcry witness at least fourteen days before the trial begins and that the trial court conduct a hearing and determine that the statement is reliable based on the time, content, and circumstances of the statements. *Id.* at art. 38.072(b)(1), (2).

The record on appeal discloses that the State timely filed the notice required by article 38.072. In addition, as already detailed above, Alvarez testified about K.A.'s outcry statement. Beyond that, the record is silent. The record does not disclose whether appellant's trial counsel requested a hearing or whether such a hearing occurred. Any determination that appellant's trial counsel was ineffective with regard to K.A.'s outcry statement would require impermissible speculation by the appellate court. *Stults*, 23 S.W.3d at 208.

## D. State's final argument

In the final part of his fifth issue on appeal, appellant contends his trial counsel's performance was deficient because he failed to object to the State's allegedly improper and prejudicial comments during the State's closing argument during the punishment phase of

appellant's trial.[9]  Appellant specifically complains of his trial counsel's failure to object to two of the State's arguments: (1) that there would be no guarantee that appellant would be deported or that he would not return to the United States to be with his children; and (2) the State's reference to a plea offer made to appellant prior to trial and, according to appellant, the State's request that the court punish appellant for the hell he put K.A. through as a result of his rejection of that offer.  In response, the State asserts appellant waived this final part of his fifth issue because he failed to brief how he was prejudiced from the improper argument as required by Rule 38.1(i) of the Rules of Appellate Procedure.[10]  We agree.

An appellant's brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and the record.  Tex. R. App. P. 38.1(i). This requirement is not satisfied by merely uttering brief, conclusory statements unsupported by legal citations.  *See King v. State*, 17 S.W.3d 7, 23 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd).  Appellant's briefing on this issue provides no citations to legal authority supporting his conclusory argument that he was prejudiced by the State's allegedly improper argument; therefore, it falls short of the minimum required to present an issue for appellate review.  *Id.*  Because appellant inadequately briefed this issue, he has waived any potential error.  *Id.*

Having addressed and rejected each contention made by appellant, we overrule his fifth and final issue.

---

[9] Appellant elected to have the trial court determine his punishment.

[10] The entire section of appellant's brief addressing prejudice consists of the following: "As regards counsel's failure to object to the prosecutor's urging that he be punished for not accepting the plea offers, prejudice is apparent in the trial court's consideration of the rejected plea offers at the time the Court assessed punishment at 20 years in prison."

## CONCLUSION

Having overruled all of appellant's issues, we affirm the trial court's judgment.

/s/     John S. Anderson
           Justice

Panel consists of Justices Anderson, Brown, and Christopher.

Do Not Publish — TEX. R. APP. P. 47.2(b).